[Cite as *State v. Kinman*, 2025-Ohio-4822.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO,                    :          APPEAL NO.    C-240622
                                             TRIAL NO.     B-2401820
    Plaintiff-Appellee,        :

  vs.                             :

ZACHARY KINMAN,                   :          *JUDGMENT ENTRY*

    Defendant-Appellant.       :


This cause was heard upon the appeal, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed, and the appeal is dismissed in part.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.


**To the clerk:**

**Enter upon the journal of the court on 10/22/2025 per order of the court.**


**By:**_____
      **Administrative Judge**

[Cite as *State v. Kinman*, 2025-Ohio-4822.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


STATE OF OHIO,                          :          APPEAL NO.    C-240622
                                                   TRIAL NO.     B-2401820
    Plaintiff-Appellee,             :

  vs.                                   :          *O P I N I O N*

ZACHARY KINMAN,                         :

    Defendant-Appellant.            :


Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed and Appeal Dismissed in Part

Date of Judgment Entry on Appeal: October 22, 2025


*Connie Pillich*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Kessler Defense LLC,* and *Stephanie Kessler*, for Defendant-Appellant.

**ZAYAS, Presiding Judge.**

{¶1}    Zachary Kinman appeals his conviction for strangulation.  In two assignments of error, Kinman contends that the trial court abused its discretion when it sentenced Kinman to 180 days' incarceration for contempt and erred when it denied Kinman's request to recall the victim, K.Y., to the stand in the defense's case.  For the following reasons, we affirm the judgment of the trial court and dismiss the appeal in part.

### Factual Background

{¶2}    Kinman was indicted for strangling his girlfriend K.Y.  At the time, he was on postrelease control.  At a pretrial hearing, the trial court found him in direct contempt of court for disrupting the proceedings by repeatedly interrupting the court.  The court imposed a 180-day jail sentence in the case numbered M-2400612.

{¶3}    Kinman decided to represent himself, and the case proceeded to a jury trial.  The State's first witness was a Cincinnati police officer who responded to a call for a disturbance.  When the officer arrived, K.Y. ran toward him, screaming for help and crying hysterically.  When asked what happened, she responded, "He beat me up. He tied me up."  K.Y. had marks on her wrists, which looked like she had been tied up. Her lip was bleeding, and she had scratches on her upper-chest area.  K.Y. identified her assailant as Kinman and said that he had beaten her, tied her up with shoestrings, and strangled her twice with his hands.  K.Y. was transported to the hospital.

{¶4}    After ensuring Kinman was no longer in the apartment, the officer provided a description of Kinman to dispatch.  Kinman had fled on foot, so the officer suspected he was still in the area.  The officer drove around the area and located Kinman.

{¶5}    The State's next witness was the victim, K.Y.  Prior to K.Y.'s testimony,

3

Kinman informed the court that he wanted the jury to "take a good look at" State's Exhibit A. The court responded, "We will get to that later." It is unclear from the record which State's exhibit Kinman was referencing. The State introduced two exhibits that were designated with the letter "A." State's Exhibit 1A was an identification photo of K.Y. taken by the emergency room and CARES nurse, and State's Exhibit 12A was a buccal swab taken from Kinman.

{¶6} K.Y. testified that Kinman was her former boyfriend of eight months. At the time of the incident, the two were living together. The morning of the incident was uneventful. They woke up and listened to music. Her phone had no service, so Kinman allowed her to use his phone to text her family. Shortly afterward, Kinman accused her of cheating, and they began to argue. After arguing for a while, Kinman apologized, but told K.Y. she was lying and that he would discover the truth.

{¶7} Kinman, who was pacing back and forth, retrieved shoestrings from the closet and approached her. Kinman demanded that she sit on the bed, and K.Y. repeatedly asked him to stop. K.Y. was afraid because his eyes were black, and he was in an angry state. Kinman threatened to kill her if she did not obey. K.Y. sat on the bed, and Kinman tied her ankles and wrists with the shoestrings. Kinman demanded that she tell him why and how she cheated and with whom. Kinman tied a T-shirt over her mouth, and she pulled it down because she could not breathe.

{¶8} K.Y. made up a story about a woman she met while doing laundry and told Kinman that the woman wanted to have sex with her. When Kinman did not like what she was saying, he would choke and strangle her. Kinman punched and slapped her. After he choked her for the 20th time, he untied her and left the bedroom.

{¶9} Kinman reentered the bedroom and accused her of having sex with a man. Kinman left the bedroom, and K.Y. followed him. When Kinman removed the

shoestrings from Army-type boots, she begged him to stop. Again, he tied her up and choked, punched, and slapped her until she told him another story about having sex with a man in their apartment while Kinman was at work. After she finished the story, Kinman untied her, hugged her, and apologized.

{¶10}  Once Kinman untied her, she put her boots on and waited for him to go to the bathroom. When he went to the bathroom, K.Y. ran down the street. A couple was sitting outside, and K.Y. told them that she needed help. The woman had K.Y. enter her apartment building and called the police. After the police arrived, K.Y. told an officer what had happened and was transported to the hospital.

{¶11}  On cross-examination, Kinman asked K.Y. how her story in court could be believed when she admitted to making up stories about her alleged infidelity. Kinman questioned her about a jail phone call that had been played in court. Kinman quoted a statement that he made on the call, and the State objected. The court responded that K.Y. did not say anything, but allowed Kinman to continue. On the jail recording, Kinman had asked K.Y. if she remembered a recording "where you said if I broke up with you or cheated on you I'm going to jail for a long time?" K.Y. responded, "Okay, like I don't even give a shit about any of that." In explaining the reference to a recording discussed in the jail call, K.Y. testified that Kinman had lied and claimed he sent a recording to his mom with the alleged threat. Kinman accused her of lying when she denied stating he would go to jail for a long time. Again K.Y. denied making that statement.

{¶12}  Kinman continued to point out what he believed were inconsistencies in her testimony. For example, he asked her how she knew the woman who had helped her was the girlfriend of the man she was with. K.Y. responded that she "assume[d] they were together because they were outside together." Kinman asked how K.Y. could

speak if she were gagged. K.Y. did not testify that she was gagged. K.Y. testified that Kinman tied a shirt around her mouth that she kept taking off. Kinman informed the court that he had no further questions for K.Y.

{¶13} Kinman asked to present Exhibit A. The court informed Kinman that he could enter the exhibit during his case-in-chief. The court excused K.Y. after the State had no additional questions for her.

{¶14} The next witness was an emergency-room and a CARES nurse. A CARES nurse assesses patients who report domestic violence, rape, or sexual assault. The nurse was called to the hospital for a report of domestic assault. The nurse created a narrative based on K.Y.'s account and conducted a medical exam. When the nurse first met with K.Y., she was anxious and crying. K.Y. reported that she was strangled, punched, slapped, and threatened. She was having difficulty swallowing, had some memory loss, persistent throat pain, and her voice was hoarse. The nurse took photos of the injuries, which were admitted into evidence. The nurse took swabs of K.Y.'s neck, fingernails, and mouth and submitted them for DNA testing.

{¶15} Kinman asked the nurse how scratches occur during strangulation. The nurse explained that when someone squeezes a neck, their nails dig into the neck. When asked what evidence proved domestic violence, the nurse explained the strangulation kit provided the evidence.

{¶16} A forensic scientist from the Hamilton County Coroner's Crime Laboratory testified that she had analyzed the swabs collected by the nurse. After obtaining a DNA sample from Kinman, she determined that the neck swabs contained DNA from K.Y. and Kinman. The swabs from K.Y.'s fingernails contained a DNA mixture from K.Y. and another individual. The DNA sample was too small to determine the identity of the second individual.

**{¶17}** The investigating officer testified he responded to a domestic-disturbance call. The officer's body-worn camera video depicted the officer's interaction with Kinman. Kinman had a backpack that contained property belonging to K.Y., including her identification and a credit card. The investigator obtained the DNA swabs from Kinman, which were submitted to the lab.

**{¶18}** Prior to Kinman's cross-examination of the investigating officer, the parties discussed jury instructions. During the conversation, Kinman repeatedly pointed out that K.Y. said "they" had been beating her on the 911 call. Kinman explained, "[K.Y.] was lying on the stand multiple times. If you listen to the phone call, you would know she was lying." The court informed Kinman that the jury would decide whether K.Y. was lying, and that he could make that argument to the jury.

**{¶19}** During the investigator's cross-examination, Kinman asked him numerous questions regarding alleged inconsistencies in K.Y.'s statements. Kinman asked, "Did you realize [K.Y.] stated that her feet were tied first and then her arms, but then switched it on her statement?" The investigator did not. Kinman then asked, "How do you think she knew Mr. Kinman had the keys, the only set of keys on him, if she reported leaving first?" The investigator answered, "I have no idea why she thought he had the keys." Kinman questioned how K.Y. knew he had a book bag with him, and the investigator explained that K.Y. "thought" he had it. It is unclear what written statement Kinman was referring to, and the referenced statement was not admitted as an exhibit or otherwise made part of the record on appeal. The investigator confirmed that he had responded to a prior call for domestic violence involving K.Y. and Kinman, and that he believed a neighbor called about the disturbance.

**{¶20}** The State rested and Kinman declined the opportunity to testify. When

7

asked if he wanted to call any witnesses, Kinman stated he wished to call K.Y. The court informed Kinman that K.Y. had already testified, Kinman had cross-examined her, and there was "no reason to call her back on the stand." Kinman responded, "Impeach her for perjury." Kinman reported to the court that he did not wish to submit any other evidence.

{¶21} The jury found Kinman guilty. The trial court sentenced Kinman to 18 months on the strangulation conviction with credit for 90 days, to be served consecutively to the case numbered 20CR150, a conviction from Clermont County. The court terminated Kinman's postrelease control and sentenced him to the remaining 624 days to be served consecutively.

## Contempt Sentence

{¶22} In his first assignment of error, Kinman contends that the trial court abused its discretion when it sentenced Kinman to 180 days incarceration for one instance of direct contempt. Relying on the statute governing sanctions for indirect contempt, Kinman contends that one sentence of not more than 30 days was appropriate. The State argues that the court did not abuse its discretion due to Kinman's insistence on disrupting the proceedings despite numerous warnings.

{¶23} On July 16, 2024, the court journalized the contempt conviction in the case numbered M-2400612. Kinman did not file a notice of appeal from the judgment entered in the case numbered M-2400612. *See* App.R. 3(A) (requiring the notice of appeal to be filed "with the clerk of the trial court within the time allowed by Rule 4."); *In re D.J.*, 2019-Ohio-288, ¶ 39 (1st Dist.) ("The failure to file a notice of appeal deprives an appellate court of jurisdiction to review a lower court's actions.").

{¶24} Accordingly, this court lacks jurisdiction to address this issue. *See In re D.J.* at ¶ 40 (Because appellant did not file a notice of appeal in that case, "we are

8

unable to address any alleged error in that case."). We dismiss the first assignment of error.

### Recalling the Victim

{¶25} In his second assignment of error, Kinman asserts that the trial court erred when it denied Kinman's request to call K.Y. to the stand in his case-in-chief. Kinman contends that he was denied his right to compulsory process and to confront witnesses against him when the trial court denied his request to recall K.Y.

{¶26} "An accused shall enjoy the right to have compulsory process for obtaining witnesses in the accused's favor under both the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution." *State v. Santibanez*, 2023-Ohio-3404, ¶ 14 (6th Dist.). "The manner of enforcing the constitutional right to compulsory process is provided by R.C. 2945.45 ('Subpoenas to issue to any country') and Crim.R. 17." *Id.* Both R.C. 2945.45 and Crim.R. 17 discuss the process to subpoena a witness to testify in court. A trial court violates a defendant's right to compulsory process by failing to enforce a subpoena. *State v. Moesle*, 2009-Ohio-1326, ¶ 13 (10th Dist.).

{¶27} In this case, Kinman did not issue a subpoena to secure the testimony of K.Y., and he cites no case law for the proposition that a defendant's right to compulsory process can be violated when the defendant fails to subpoena the witness.

{¶28} Kinman also contends that the trial court violated his right to confront witnesses against him when it denied his request to recall the victim in his case-in-chief. "The Sixth Amendment to the U.S. Constitution gives a defendant the right 'to be confronted with the witnesses against him.'" *State v. McKelton*, 2016-Ohio-5735, ¶ 170. Article 1, Section 10 of the Ohio Constitution also guarantees that "the party accused shall be allowed . . . to meet the witnesses face to face." *See id.* That

constitutional protection "guarantees only 'an opportunity for effective cross-examination.'" *Id.*, citing *State v. Lang*, 2011-Ohio-4215, ¶ 83, quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). Where an accused cross-examined a witness at trial, "[his] argument that he was not able to confront the witnesses against him in violation of his constitutional rights is without merit." *State v. Hernandez-Martinez*, 2012-Ohio-3754, ¶ 22 (12th Dist.).

**{¶29}** Here, Kinman thoroughly cross-examined K.Y. Upon completion of his questioning of K.Y, Kinman represented to the court that he had no additional questions for K.Y. Kinman cites no case law for the proposition that a defendant's right to confront the witnesses against him can be violated when the defendant had the opportunity to cross-examine the witness.

**{¶30}** Accordingly, we overrule the second assignment of error.

## Conclusion

**{¶31}** Having dismissed Kinman's first assignment of error and overruled his second, we affirm the judgment of the trial court.

Judgment affirmed and appeal dismissed in part.

**NESTOR** and **MOORE, JJ.,** concur.